Waldo J. Martínez RIVERA, a/k/a Waldo José Martínez Rivera, and Glenda L. Colón López, a/k/a Glenda Liz Colón López, Debtors.

José R. Carrión, Chapter 13
Trustee, Appellant,

v.

Waldo J. Martínez Rivera and Glenda L. Colón López, Appellees.

BAP Nos. PR 12–066, PR 12–067.
Bankruptcy No. 11–07492–EAG.

United States Bankruptcy Appellate Panel of the First Circuit.

April 5, 2013.

José R. Carrión, Esq., Trujillo Alto, PR, and Alexandra Rodríguez Díaz, Esq., San Juan, PR, on brief for Appellant.

Edgardo Mangual González, Esq. and José Jiménez Quiñones, Esq., on brief for Appellees.

Before HAINES, FEENEY, and HOFFMAN, United States Bankruptcy Appellate Panel Judges.

FEENEY, Bankruptcy Judge.

José R. Carrión, the chapter 13 trustee, appeals the order confirming the chapter 13 plan proposed by the debtors, Waldo Martínez Rivera and Glenda Colón López.[1] For the reasons set forth below, the order is **AFFIRMED.**

## BACKGROUND[2]

The pertinent facts are uncontested. The debtors filed a chapter 13 petition on August 31, 2011. They filed their schedules of assets and liabilities and a chapter 13 plan, together with other required documents, on the same day. Their Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income reveals that the debtors, whose income is above the median income for the District of Puerto Rico, have an applicable commitment period of 60 months and monthly disposable income of $543.29. The parties agree, however, that, after adjustment, their monthly disposable income is $501.29 and their projected disposable income for payment over the life of their plan is $30,044.40. Their schedules I and J–Current Income and Expenses of Individual Debtor(s) reveal that the debtors have monthly net income of $700.00.

Through their chapter 13 plan, the debtors proposed to pay to the trustee $700.00 per month for 12 months, $788.00 per month for 48 months, and $50,000.00 in one

1. On September 10, 2012, the bankruptcy court entered two orders, one confirming the debtors' plan and another both confirming the debtors' plan and overruling the trustee's objection to confirmation. Recognizing that the orders are redundant, the trustee sought and received from the BAP an order consolidating the appeals.

2. All references to the "Code", the "Bankruptcy Code", or to specific statutory sections are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101, *et seq.*

lump sum within 56 months on or before the expiration of the plan term, for a total of $96,224.00. Pursuant to the plan, the trustee is to pay from the debtors' plan payments his statutory commission; $2,900.00 in the debtors' attorney's fees;[3] $9,900.19 in pre-petition arrears to secured creditor, Firstbank de Puerto Rico; $33,182.02 as payment in full to another secured creditor, Banco Bilbao Vizcaya Argentaria ("BBVA"); $1,210.00 for insurance payable to the trustee; and $3,519.01 to pay in full priority claims filed by the Internal Revenue Service and the Puerto Rico Department of Treasury. The plan also provided for the making of adequate protection payments to BBVA prior to confirmation. The liquidation value of the debtors' unencumbered, non-exempt assets totaled $1,436.00.

The plan also provided for payments to two additional classes of creditors, Cooperativa de Ahorro y Crédito Villa–Coop Agustín Burgos Rivera ("Villa–Coop"), and general unsecured creditors. Villa–Coop filed a proof of claim in the amount of $36,777.16. The claim arises from a personal loan obtained by the debtor, Waldo J. Martínez Rivera, which was guaranteed by his mother-in-law. The loan qualifies as a consumer debt under § 101(8).[4] The claim is bifurcated into a secured portion of $11,315.21 and an unsecured portion of $25,461.95. The debtors proposed to satisfy the secured portion of Villa–Coop's claim, "by setting-off the petitioning husband's shares given in collateral" to Villa–Coop. They proposed to pay the unsecured portion of Villa–Coop's claim, which represents 9.78 percent of the total unsecured claims, in full. The remaining unsecured creditors, whose claims total $260,403.74, will receive an estimated dividend of 4.51 percent. That dividend would increase to approximately 12 percent if the debtors distributed their projected disposable income of $30,077.40 pro rata to all unsecured creditors, including Villa–Coop.

On March 7, 2012, the trustee objected to the proposed treatment of the unsecured portion of Villa–Coop's claim by filing "Trustee's Unfavorable Report on Proposed Plan Confirmation under § 1325." In his report, the trustee stated:

The proposed (amended) Plan can not be confirmed because it has the following deficiencies:

- Unfair Discrimination [11 U.S.C. § 1322(a)(3) & (b)(1)]

This case has a general unsecured pool of $30,077.40. Although the plan is sufficient to pay the same, Debtor is allocating almost the entire amount to pay a co-debtor debt with Villa Coop. While Debtor may provide some preference to such debt, it is unfair discrimination to spend the general unsecured pool on just one debt. Debtor must amend plan to distribute the general unsecured pool among all unsecured creditors and any amounts left after such distribution may be used to pay ahead Villa Coop [sic].

The bankruptcy court held a confirmation hearing on March 13, 2012, and, on September 10, 2012, following the submission of a Statement of Uncontested Facts and briefs, issued an opinion, summarized below, in which it overruled the trustee's objection and stated its intention to enter a confirmation order. *See In re Rivera*, 480 B.R. 112 (Bankr.D.P.R.2012). On the

---

3. The confirmation order entered by the bankruptcy court provided for the payment of $3,000.00 in attorney's fees, less any retainer.

4. Pursuant to § 101(8), "[t]he term 'consumer debt' means debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).

same day, the bankruptcy court entered an order confirming the debtors' plan.

The bankruptcy court determined that the debtors' treatment of Villa–Coop's unsecured claim was permissible under § 1322(b)(1), and that § 1325(b)(1) does not require pro rata distribution of the debtors' projected disposable income. Noting disagreement among courts as to the proper interpretation of § 1322(b), the bankruptcy court followed the minority view and determined that "there is a strong pragmatic basis for exempting co-signed consumer debts-undertaken for debtor's benefit-from the unfair discrimination restrictions applicable to other types of debt." *In re Rivera*, 480 B.R. at 116 (citing *In re Renteria*, 456 B.R. 444, 449 (Bankr.E.D.Cal.2011), *aff'd on other grounds*, 470 B.R. 838 (9th Cir. BAP 2012) ("[T]his court is persuaded that Congress added the [h]owever [c]lause to § 1322(b)(1) specifically to carve out an exception to the 'unfair discrimination' test, an exception that only applies to co-debtor-consumer claims."); *In re Monroe*, 281 B.R. 398, 400 (Bankr.N.D.Ga.2002) ("[T]he language of § 1322(b)(1) creates an exception to the unfair discrimination test in cases involving a co-signed debt.")).

The bankruptcy court rejected the trustee's argument that the debtors' plan failed to satisfy the disposable income test set forth in § 1325(b)(1), reasoning that § 1325(b)(1) simply requires that all of debtors' projected disposable income be paid to "unsecured creditors under the plan," and emphasizing that "[t]his section does not address how this income is to be allocated." *Rivera*, 480 B.R. at 116 (citing *In re Knight*, 370 B.R. 429 (Bankr.N.D.Ga. 2007)). The bankruptcy court concluded that because the debtors were dedicating all of their projected disposable income under their plan to pay either the unsecured portion of Villa–Coop's claim or oth-er unsecured claims, the plan complied with § 1325(b)(1). *Id.* at 116–17. This appeal followed.

## *JURISDICTION*

■ We are empowered to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *id.* at 646 (internal quotations and citations omitted), whereas an interlocutory order " 'only decides some intervening matter pertaining to the cause, and ... requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.' " *Id.* (quoting *In re Am. Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)). An order confirming a chapter 13 plan over the objection of a party in interest is a final order. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 130 S.Ct. 1367, 1376, 176 L.Ed.2d 158 (2010); *Bank of the Prairie v. Picht (In re Picht)*, 428 B.R. 885 (10th Cir. BAP 2010); *Ed Schory & Sons, Inc. v. Francis (In re Francis)*, 273 B.R. 87, 89 (6th Cir. BAP 2002). Thus, appellate jurisdiction exists in this case.

## *STANDARD OF REVIEW*

■ Appellate courts apply the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law. *See DeGiacomo v. Traverse (In re Traverse)*, 485 B.R. 815 (1st Cir. BAP 2013) (citing *Lessard v. Wilton–Lyndeborough Coop. Sch. Dist.*, 592 F.3d 267, 269 (1st Cir. 2010)). As the facts are uncontested and the appeal involves the interpretation of two sections of the Bankruptcy Code, we

review the bankruptcy court's decision *de novo.*

## ISSUES ON APPEAL

This appeal requires a determination of two issues:

1. Whether a plan that separately classifies an unsecured debt for which a non-debtor co-obligor is liable with a chapter 13 debtor complies with the disposable income test of 11 U.S.C. § 1325(b)(1)(B) if that creditor is to be paid more than its pro rata share of the debtors' projected disposable income to the detriment of other unsecured creditors?

2. Whether the separate classification and full payment of an unsecured claim for a consumer debt of the debtor and a non-debtor co-obligor is permissible as a matter of law under 11 U.S.C. § 1322(b)(1) where all other unsecured creditors are receiving a smaller dividend; and, if not, what standard applies to determine whether payment of such a claim complies with the statute?

## DISCUSSION

### I. The Meaning of § 1325(b) in the Context of the "However Clause" of § 1322(b)(1)

Section 1325(b) provides in pertinent part:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be *applied to make payments to unsecured creditors under the plan.*

11 U.S.C. § 1325(b)(1) (emphasis supplied).

### A. The Positions of the Parties

The debtors align their arguments with the bankruptcy court's decision. The trustee takes issue with the bankruptcy court's determination, in reliance upon *In re Knight,* 370 B.R. at 429, that § 1325(b)(1)(B) simply requires that all of the debtors' projected disposable income be paid to "unsecured creditors under the plan" and does not address how that income is to be allocated. *See also In re Pracht,* 464 B.R. 486, 489 (Bankr.M.D.Ga. 2012).

The trustee essentially makes policy arguments in support of reversal. He maintains that, if the purpose of § 1325(b)(1) is to allow debtors to choose how to control the distribution of their projected disposable income, Congress could have so provided in the text. He asserts that the omission should not be construed to add the power to choose, citing the canon of construction, *causus omissus pro omisso habendus est,* namely that "nothing is to be added to what the text states or reasonably implies." *See Prete v. Roger Williams Univ. Sch. of Law,* No. 12–cv–474–JL, 2012 WL 6203083, at *4 (D.N.H. Dec. 12, 2012) (defining Latin canon of construction). He further asserts that "this principle must be reconciled with the principle that a text includes, not only what is expressed, but also what is implicit," adding that an analysis of the statute's language shows that the evident purpose of § 1325(b)(1) is to require the equal distribution of the debtors' projected disposable income among all of their creditors. In the trustee's view, the purpose is evi-

dent because upon objection by the trustee or an unsecured creditor a debtor must choose between two alternatives as a condition of confirmation: (1) full payment of all unsecured claims; or (2) the commitment of all projected disposable income to fund the plan. The trustee rejects the bankruptcy court's holding that permits the debtors to decide how and to whom projected disposable income should be distributed because the choice under subsection (B) is both an inadequate counterpart to subsection (A) and illogical and contrary to the principles embodied in the Bankruptcy Code. He urges the Panel to conclude that pro rata distribution of projected disposable income among all unsecured creditors is the only fair counterpart to not paying them in full. He further contends that any other conclusion elevates a discretionary provision with respect to plan contents under § 1322(b)(1) over mandatory confirmation requirements under § 1325(b), rendering § 1325(b)(1)(B) meaningless.

The trustee adds that the bankruptcy court's interpretation § 1325(b)(1)(B)'s phrase "applied to make payments to unsecured creditors" is simply not a fair reading of the text and that the interpretation he advocates is consistent with one of the basic tenets of bankruptcy law, namely the equality of distribution among unsecured creditors. He cites *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 953

(1st Cir.1976) ("We begin with the premise that the theme of the Bankruptcy Act is 'equality of distribution'. 'If one claimant is to be preferred over others, the purpose should be clear from the statute.'"); and *Bentley v. Boyajian (In re Bentley)*, 266 B.R. 229, 240 (1st Cir. BAP 2001). In *Bentley*, the court, citing *Mammoth Mart* and *Sampsell*, stated:

> The principle of equality of distribution has been carried forward as one of the guiding principles of the Bankruptcy Code. The principle is evident even in the section now at issue, in that § 1322(b)(1) places the burden on the debtor to justify as fair any difference in treatment among general unsecured creditors. As a general rule, then, fairness in Chapter 13 requires equality of distribution among nonpriority unsecured creditors, and the burden of justification is on those who propose plans to the contrary.

266 B.R. at 240.

The trustee also argues that if debtors are allowed to distribute projected disposable income, or PDI, as they see fit, the so-called "means test" established by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 would become meaningless.[5] In support of his position, the trustee cites *Ransom v. FIA Card Servs., N.A.*, — U.S. ——, 131 S.Ct. 716, 721, 178 L.Ed.2d 603 (2011), and *Hamilton v. Lanning*, — U.S. ——, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010), as well as *In re Sharp*, 415 B.R. 803 (Bankr. D.Colo.2009) (no unfair discrimination

---

**5.** As noted by the Eighth Circuit in *Coop v. Frederickson (In re Frederickson)*, 545 F.3d 652 (8th Cir.2008):

> In determining a debtor's projected disposable income pre-BAPCPA, the bankruptcy court calculated a debtor's disposable income based on Schedules I and J and then multiplied that number by the number of months in the plan. This process remains

the same post-BAPCPA for below-median debtors. But for above-median debtors, Congress wanted to eliminate what it perceived as widespread abuse of the system by curtailing the bankruptcy courts' discretion and requiring debtors to pay more to their unsecured creditors.

*Id.* at 658 (citations omitted).

where debtors paid student loan debt outside plan with discretionary income and paid all unsecured creditors, including student loan creditors, their pro rata share of projected disposable income),[6] and *In re Abaunza*, 452 B.R. 866 (Bankr.S.D.Fla. 2011) (where debtors proposed to pay all of their PDI to all unsecured creditors other than the holders of the student loan debt who were paid outside the plan with discretionary income, there was no unfair discrimination). In the two bankruptcy cases, the courts confronted the disconnect between the calculation of projected disposable income and debtors' actual income and expenses, which produced situations where the debtors' actual monthly income exceeded their projected disposable income. Under those circumstances, the debtors may make payments in excess of their projected disposable income to student loan or other creditors. *In re Abaunza*, 452 B.R. at 873.

The trustee further argues that application of the tests set forth in *Bentley* or *In*

re *Thompson*, 191 B.R. 967, 971–72 (Bankr.S.D.Ga.1996), requires a determination that the debtors' plan does not comply with confirmation requirements. The argument, however, is predicated upon a construction of § 1325(b) which would require the pro rata distribution of projected disposable income. Thus, the trustee concludes that classification of Villa–Coop's claim constitutes an act of unfair discrimination. Finally, the trustee contends that *In re Knight* and *In re Pracht* were wrongly decided because the courts in those cases did not give effect to the principle of equality of distribution.

**B. Analysis**

█ What appears to be behind the trustee's argument is the belief that the debtors should pay all unsecured claims, including Villa–Coop's unsecured claim, pro rata from projected disposable income, while paying more to Villa–Coop's claim only from their discretionary income.

---

6. The court in *Sharp* observed:

> [M]any of the student loan cases addressing unfair discrimination are pre-BAPCPA cases. The passage of BAPCPA did not alter the language of § 1322(b)(1) or § 1322(b)(5), giving pre-BAPCPA cases continued relevance. Nevertheless, the Court agrees that BAPCPA impacts the analysis, at least in some cases, because BAPCPA altered the calculation of "projected disposable income" which an above-median income debtor must commit to a plan (assuming a creditor or the trustee objects) and added a requirement that a debtor pay his or her PDI to unsecured creditors. PDI is essentially the "pot" that a debtor must distribute to unsecured creditors in a manner that does not unfairly discriminate.

415 B.R. at 809–10 (footnote omitted). In *Sharp*, the debtors paid student loan creditors outside the plan with discretionary income and distributed projected disposable income to unsecured creditors, including the student loan creditors. The court overruled the trustee's objection, noting the following:

> Under these unique circumstances, the Court concludes that the discretionary payments to student loan creditors are not unfairly discriminatory, since Class 4 creditors are receiving all they are entitled to receive under § 1325(b). To hold otherwise would subvert the disposable income test in § 1325(b) by requiring a debtor to pay more than PDI to unsecured creditors. The Court will not use the unfair discrimination test as a way around the new PDI calculation imposed by BAPCPA.
> 　　　　* * *
> Equality of distribution among unsecured creditors, absent an express grant of priority or cause for subordination, is a baseline principle of Chapter 13. Debtors are proposing just that—equal distribution of their respective PDI among all unsecured creditors. There is no discrimination, and hence no unfair discrimination, between claimants holding dischargeable and nondischargeable unsecured claims. Pro rata, or proportionate distribution, by definition does not discriminate.

*Id.* at 812, 813 (footnotes omitted).

Thus, the trustee's argument would appear to write § 1322(b)(1) out of the statute for below median income debtors; for above median income debtors without income in excess of their projected disposable income; and for those with discretionary income in excess of projected disposable income who, unlike the debtors in this case, elect to retain their discretionary income to avoid the trustee's commission.

The bankruptcy court's determination that nothing in § 1325(b)(1) requires pro rata distribution to creditors for which there is a co-obligor is evident from the plain language of the statute. Additionally, the bankruptcy court's reliance on *In re Knight*, was justified. In *Knight*, the bankruptcy court stated:

> The Trustee's view requires a reading of § 1325(b)(1)(B) as requiring that all PDI be paid on a pro rata basis to all unsecured creditors. But the language in this provision does not address the allocation of payments among various types of unsecured creditors. To the contrary, another provision, § 1322(b)(1), which permits classification of unsecured claims, governs the allocation issue. Section 1322(b)(1) provides that a plan "may designate a class or classes of unsecured claims . . . but may not dis-

criminate unfairly against any class so designated."

370 B.R. at 432.

■ Section 1325(b)(1) simply does not address allocation of projected disposable income. Were the Panel to adopt the trustee's position, as mentioned above, it would essentially subvert § 1322(b)(1). The bankruptcy judge's ruling also is consistent with canons of statutory construction. Section 1322(b)(1) is a more specific provision than § 1325(b)(1), and " 'it is a commonplace of statutory construction that the specific governs the general.' " *RadLAX Gateway Hotel v. Amalgamated Bank*, — U.S. —, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).[7]

## II. The Meaning of § 1322(b)(1)

### A. The Positions of the Parties

The trustee contends that § 1325(b)(1) mandates equal treatment of unsecured claims and, therefore, a debtor can only use discretionary income, i.e., income in excess of projected disposable income, to pay creditors separately classified under § 1322(b)(1). The debtors rely on the de-

---

7. In *RadLAX*, the Supreme Court, in the context of construing § 1129(b)(2)(A), added:

> The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one. But the canon has full application as well to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." . . .

> "It is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. This rule applies wherever an act contains general provisions and also special ones upon a subject, which, standing alone, the general provisions would include."

132 S.Ct. at 2071 (citations omitted).

cision of the bankruptcy court in support of their arguments on the issue.

### B. Interpretations of § 1322(b)(1)

Section 1322(b)(1) provides:

Subject to subsections (a) and (c) of this section, the plan may—

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims; . . .

11 U.S.C. § 1322(b)(1). As a result of § 1322(b)(1)'s references to § 1322(a) and § 1122, its provisions are subject to § 1322(a)(3), which requires a chapter 13 debtor to "provide the same treatment for each claim within a particular class" if the plan classifies claims, and § 1122(a), which permits a debtor to place a claim or an interest in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class," or to create an administrative convenience class. Thus, pursuant to § 1322(b)(1) and without reference to the so-called "however clause," a debtor may separately classify a claim if it is substantially similar to other claims in the class, if it provides the same treatment for each claim in the class, and if it does not discriminate unfairly. 11 U.S.C. § 1322(b)(1).

The court in *Bentley, supra,* addressed the separate classification of a nondischargeable student loan debt, discussing various approaches to determining unfair discrimination. Specifically, the court in *Bentley* considered the meaning of the words "discriminate" and "unfairly." *See generally* Stephen L. Sepinuck, *Rethinking Unfair Discrimination,* 74 Am. Bankr.

L.J. 341 (Fall 2000). The *Bentley* court determined that the term discriminate had no pejorative connotation in the context of § 1322(b)(1). 266 B.R. at 237. With respect to the meaning of "unfairly," it determined that the operative term was "fair," and held that as a baseline against which to evaluate discriminatory provisions for fairness, "we look to the principles and structure of Chapter 13 itself." *Id.* at 240. As a consequence, the *Bentley* court focused on the impact of the discrimination on the Bankruptcy Code's distribution scheme and the policy of equality of distribution, rules of priority, optional or mandatory contributions with reference to § 1325(b)(1), and the fresh start policy of the Bankruptcy Code. *Id.* at 240–42.

The issues posed in this appeal, however, hinge, not on whether the debtors are discriminating unfairly in their treatment of Villa–Coop's claim in the way, for example, a debtor might favor a student loan creditor with a nondischargeable debt as was the case in *Bentley*, but on the so-called "however clause," which permits the debtors to treat Villa–Coop's claim "differently than other unsecured claims." That clause was added to § 1322(b)(1) by the 1984 amendments to the Bankruptcy Code and has engendered controversy ever since. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333 (1984).

The United States Bankruptcy Appellate Panel of the Ninth Circuit in *In re Renteria, supra,* recently set forth a thoughtful exegesis of statutory construction relating to § 1322(b)(1) and analyzed a number of decisions. It did so in the context of a *de novo* review of a bankruptcy court order overruling the chapter 13 trustee's objection to a plan pursuant to which the debtor proposed to pay an attorney, whose fees her mother guaranteed, in full with interest, and virtually

nothing to her other unsecured creditors. The bankruptcy court had determined that the language of § 1322(b)(1) was plain and allowed separate classification. *In re Renteria*, 456 B.R. at 449 ("[T]he wording of the However Clause is not ambiguous. By giving effect to the plain meaning of the statute, this court is persuaded that Congress added the However Clause to § 1322(b)(1) specifically to carve out an exception to the 'unfair discrimination' test, an exception that only applies to co-debtor-consumer claims.").

The panel in *Renteria* noted that those courts that hold that § 1322(b)(1) is not ambiguous rely on the "rule of the last antecedent." 470 B.R. at 842. In other words, those courts carve out codebtor consumer claims from the requirements of the unfair discrimination rule, emphasizing "the placement of the 'however clause' immediately following the unfair discrimination rule." *Id.* In essence, these cases apply the "rule of the last antecedent." According to that rule, " '[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.' " *Id.* (quoting 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.33 (7th ed. 2011)).

The *Renteria* panel, nevertheless, noted that the rule is not absolute, observing that the plain meaning adherents "tend to ignore or discount the distinctive language used in the unfair discrimination rule and in the 'however clause.' " *Id.* The panel stated that the difference between the unfair discrimination rule and the "however clause" "arguably suggests that Congress intended something other than to completely exempt codebtor consumer claims from the unfair discrimination rule," adding that this is the majority approach. *Id.* The *Renteria* panel opined that the majority of courts, like those in *In re Battista*, 180 B.R. 355 (Bankr.D.N.H.1995), and *Nelson v. Easley (In re Easley)*, 72 B.R. 948 (Bankr.M.D.Tenn.1987), has utilized "either explicitly or implicitly a different rule of statutory construction: 'when [Congress] uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.' " *Id.* (citing 2A *Sutherland on Statutory Construction* at § 46.6).[8]

In addition, the *Renteria* panel observed that some courts emphasizing the language differences in § 1322(b)(1) "have taken this argument too far, to the point of rendering the "however clause" meaningless, by giving the clause no effect whatsoever." *Id.* at 843 (citing *In re Strausser*, 206 B.R. 58, 59–60 (Bankr.W.D.N.Y.1997); *In re Easley*, 72 B.R. at 955–56). As a result, according to the panel, those courts have violated the canon of statutory construction that requires a statute to be construed

---

8.  The panel added:

    Courts emphasizing the language difference between the unfair discrimination rule and the "however clause" tend to conclude that the "however clause" was not meant to wholly exempt codebtor consumer claims from the unfair discrimination rule. *See* Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy*, 4th Edition, www.ch13online.com, § 150.1, at ¶ [3] & n.3 (Rev. Apr. 14, 2009) (collecting cases) ... Many of these cases further point out that, if Congress intended to wholly exempt codebtor consumer claims from the unfair

    discrimination requirement, they easily could have done so by using more straightforward language. *See, e.g., In re Applegarth*, 221 B.R. 914, 916 (Bankr.M.D.Fla. 1998); *In re Battista*, 180 B.R. at 357; *see also Chapter 13 Bankruptcy, supra*, 150.1, at ¶ [26] ("The Code could have said that all separate classifications of co-signed claims are permitted if Congress intended that the existence of a cosigner justified all different treatments. Because the statute does not say that, it is fair to infer that some justification is required.").

    *Renteria*, 470 B.R. at 842–43.

"so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant...." *Id.* (citing, *inter alia, Corley v. United States,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (citations and internal quotation marks omitted)).

The *Renteria* panel also referenced decisions in which courts have taken a middle ground, concluding that the "however clause" was meant to limit the unfair discrimination rule's application to codebtor consumer claims. *Id.* at 843 (citing *Ramirez v. Bracher (In re Ramirez),* 204 F.3d 595, 596 (5th Cir.2000); *Chacon v. Bracher (In re Chacon),* 202 F.3d 725, 726 (5th Cir.1999); *Spokane Ry. Credit Union v. Gonzales (In re Gonzales),* 172 B.R. 320, 328–30 (E.D.Wash.1994)). The panel, however, criticized those decisions, noting a struggle to apply the unfair discrimination rule in a limited or qualified manner, and adding that "even though the middle-ground courts give lip service to the notion that the "however clause" somehow limits or restricts the unfair discrimination rule's application to codebtor consumer claims, in practice the result is virtually always the same as if Congress never had added the "however clause" to the statute." *Id.* (footnote omitted).

Faced with the divergent views and "battling canons of statutory construction," the *Renteria* panel, like the bankruptcy court in this case, concluded it was "unable to derive from the text of the statute a plain and unambiguous meaning for the 'however clause.'" *Id.* at 844. Thus, in the absence of legislative history accompanying the 1984 amendments, it turned to the committee reports for the Bankruptcy Improvements Act of 1981 and the Omnibus Bankruptcy Improvements Act of 1983— predecessor bills leading up to the passage of the 1984 amendments. *Id.* Based upon the cases cited in the reports, *i.e., In re*

*Utter,* 3 B.R. 369 (Bankr.W.D.N.Y.1980), and *In re Montano,* 4 B.R. 535 (Bankr. D.D.C.1980), cases in which the courts refused to permit separate classification of consumer claims involving codebtors, and cases which Congress intended to address in amending the statute, as well as the language employed in S.Rep. No. 98–65(1983), cited by the bankruptcy court in this case, the panel affirmed the bankruptcy court's decision to overrule the trustee's objection and confirm the debtor's plan. Notably, the *Renteria* panel did not adopt a specific approach. Indeed, in a concurring opinion, Judge Pappas stated that "[t]he majority Opinion prefers to affirm the bankruptcy court's decision based on the facts. While providing a comprehensive justification for a possible interpretation of § 1322(b)(1), this Opinion stops short of adopting its solution to the underlying statutory mystery for now, suggesting that the Panel must wait for better facts before taking a firm stand." 470 B.R. at 849.

## C. Analysis

■ The panel in *Renteria* cited *In re Thompson,* 191 B.R. at 971–72, noting "its test may be of some future benefit to other courts struggling to apply the unfair discrimination rule in a limited or qualified manner." That test requires an examination of the following: (1) whether the claim truly is a codebtor consumer claim, *see* 11 U.S.C. § 101(8); *Meyer v. Hill (In re Hill),* 268 B.R. 548, 554 (9th Cir. BAP 2001) (holding that the "however clause" did not apply to a claim when the third party liable on that claim was not really the debtor's codebtor); (2) whether the codebtor undertook the underlying liability for the debtor's benefit or vice-versa, *see In re Gonzales,* 172 B.R. at 329–30 (holding that preferential treatment of co-signed claim was unfair when debtor co-signed debt for the benefit of the codebt-

or); *In re Rivera,* 480 B.R. at 116; and (3) whether the plan satisfies the other requirements for plan confirmation, particularly the good faith requirement under § 1325(a)(3), *see In re Thompson,* 191 B.R. at 971–72. *Renteria,* 470 B.R. at 843 n. 6. Notably, the presence or absence of good faith permeates the *Thompson* analysis and permits separate classification in most circumstances absent evidence of bad faith. The Panel agrees with the panel in *Renteria* that the analytical framework set forth in *Thompson* is useful when reviewing classification issues.

■ The first two questions posed by the court in *Thompson* are neither disputed nor at issue in this appeal. Examination of the third component of the test results in affirmance of the bankruptcy court's decision. The bankruptcy court's focus on "the practical realities of codebtor claims" was warranted. *Rivera,* 480 B.R. at 115 (citing S.Rep. No. 65, 98th Cong., 1 st Sess., pp. 17–18 (1983)) ("Although there may be no theoretical differences between codebtor claims and others, there are important practical differences. Often, the codebtor will be a relative or friend, and the debtor feels compelled to pay the claim. If the debtor is going to pay the debt anyway, it is important that this fact be considered in determining the feasibility of the plan.").[9] Thus, the bankruptcy court properly determined that the classification scheme was proposed in good faith and satisfies plan confirmation requirements.

9. The bankruptcy court added:
Indeed, Congress found that separate classification of codebtor claims may be "practically necessary" to avoid a "ripple effect," by which codebtors, unable to make the payments either, are also forced to declare bankruptcy. *Id.* Given that under Section 1301 creditors may pursue collection activities against a codebtor who is not in bankruptcy for the portion of their claim that is

## CONCLUSION

For the reasons set forth above, the decision of the bankruptcy court is **AFFIRMED.**

not being paid through the plan, 11 U.S.C. § 1301, the court finds that there is a strong pragmatic basis for exempting cosigned consumer debts—undertaken *for debtor's benefit*—from the unfair discrimination restrictions applicable to other types of debt.
*In re Rivera,* 480 B.R. at 116 (emphasis added).